OPINION OF THE COURT
Andrew Halloran, J.
Introduction
The defendant is charged with vehicular manslaughter in the second degree (Penal Law § 125.12 [1], [2]), criminally negligent homicide (Penal Law § 125.10), driving while intoxicated (Vehicle and Traffic Law § 1192 [2]), driving while intoxicated (Vehicle and Traffic Law § 1192 [3]), failure to keep right (Vehicle and Traffic Law § 1120 [a]), unsafe tire (Vehicle and Traffic Law § 375 [35] [c]), and speed not reasonable (Vehicle and Traffic Law § 1180 [a]).
The charges arise out of an incident on January 21, 2002 in which the defendant allegedly operated his vehicle in a snowstorm in an intoxicated condition with unsafe tires; lost control of the vehicle on a curve; crossed the center line; and hit another vehicle head on causing injuries to the driver of the other vehicle which resulted in his death.
The defendant filed his attorney’s affirmation in support of an omnibus motion on May 20, 2002. The People filed an affirmation in opposition to the motion on June 4, 2002. The defendant filed a reply affidavit and reply affirmation of his attorney on June 14, 2002. The People filed a supplemental affirmation in opposition on June 27, 2002. The defendant’s attorney filed a supplemental affirmation in support on July 2, 2002. The People filed a letter in opposition on July 18, 2002 and the defendant’s attorney filed an affirmation in response on July 25, 2002.
Inspection of Grand Jury Minutes
Defendant requests an in camera inspection of the grand jury minutes to determine the sufficiency of the evidence and the adequacy of the legal instructions. The People have not *699 shown good cause to deny the motion for an in camera inspection. The motion to inspect should, therefore, be granted. (CPL 210.30 [3].)
This court has, therefore, inspected the grand jury minutes relating to Indictment No. 02-019 and has determined that the motion to dismiss the indictment should be denied.
The standard of review of the sufficiency of evidence presented to the grand jury is “whether the evidence, viewed most favorably to the People, if unexplained and uncontradicted— and deferring all questions as to the weight or quality of the evidence — would warrant conviction.” (People v Carroll, 93 NY2d 564, 568 [1999]; People v Parrotte, 267 AD2d 884 [1999].)
Based upon that standard, the evidence presented to the grand jury was sufficient to support each count of the indictment. The instructions and presentation of the evidence in respect to each count of the indictment were not defective as a matter of law.
Alleged Facial Insufficiency of the Indictment
The defendant’s indictment alleges the crimes charged in the language of the statute and with sufficient factual information to comply with CPL 200.50. The branch of defendant’s motion which seeks dismissal on the grounds that the indictment is facially insufficient should, therefore, be denied.
Alleged Defective Grand Jury Proceeding
The motion to dismiss the indictment because of alleged defects in the grand jury proceedings should also be denied. The grand jury was legally constituted; the proceedings were conducted before more than 16 grand jurors; and 12 or more concurred in the findings. The grand jury proceedings were not defective. They complied with CPL article 190. (CPL 210.20 [1] [c]; 210.35 [5].) The instructions and presentation of the evidence in respect to each count of the indictment were not defective as a matter of law.
Vehicle and Traffic Law § 1194 (4) Blood Draw
The defendant seeks an order suppressing the results of a blood test which indicated that his blood alcohol content was .15% by weight. The defendant alleges that his blood was not drawn in accordance with the procedures set forth in Vehicle and Traffic Law § 1194 (4). The People’s supplemental affirmation filed June 27, 2002 states that the defendant’s blood was drawn by an advanced emergency medical technician. The de *700 fendant specifically alleges that the advanced emergency medical technician was not acting under the supervision and at the direction of a physician as required by Vehicle and Traffic Law § 1194 (4) (a) (1) (ii). He also claims that his blood was taken in violation of the physician-patient privilege (CPLR 4504).
Vehicle and Traffic Law § 1194 (4) (a) (1) provides in pertinent part as follows:
“At the request of a police officer, the following persons may withdraw blood for the purpose of determining the alcoholic or drug content therein: (i) a physician, a registered professional nurse or a registered physician’s assistant; or (ii) under the supervision and at the direction of a physician: * * * an advanced emergency medical technician as certified by the department of health * * * .”
On August 22, 2002 this court held an evidentiary hearing, pursuant to CPL 710.60 (4), regarding the taking of defendant’s blood and specifically whether his blood was drawn by an advanced emergency medical technician acting “under the supervision and at the direction of a physician” as required by Vehicle and Traffic Law § 1194 (4) (a) (1) (ii).
The defendant filed a memorandum of law on September 2, 2002 and the People filed a memorandum of law on September 6, 2002.
Dr. Michael Pond, physician’s assistant (hereafter P.A.) Roy F.C. Parker, and advanced emergency medical technicians (hereafter AEMT) Jody C. Winch and Heather L. Borachok testified at the hearing.
Dr. Pond testified that he is the director of emergency medical services at Adirondack Medical Center in Saranac Lake, New York, and that he is also in charge of the emergency room at Adirondack Medical Center’s satellite medical facility in Lake Placid, New York. He testified that the Lake Placid emergency room is normally staffed by a P.A., a registered nurse (hereafter R.N.), and one or more AEMTs; that the AEMTs always operate under the general supervision and direction of a medical doctor (hereafter MD); that protocol authorizes P.A.’s to do some things without contacting an MD and requires them to contact an MD for other procedures. He further testified that he was not working on January 21, 2002; that he was not present at the Lake Placid emergency room; and that he does not know where he was on that date, except that he was someplace in the State of New York.
P.A. Parker testified that he was the P.A. in charge of the emergency room on January 21, 2002; that defendant and Jack *701 Shea, the driver of the other car, were brought into the emergency room; that the emergency room staff received information that there was a second motor vehicle accident and that additional patients would be brought to the emergency room in addition to those already there; that Mr. Shea had passed out in the x-ray room and was in critical condition; that Mr. Shea needed the immediate attention of all the emergency room staff and rescue squad personnel; and that while they were working on Mr. Shea, a police officer came to him and requested that blood be drawn from defendant for the purpose of testing for alcohol. He further testified that he requested and received defendant’s consent to the drawing of defendant’s blood and then directed either AEMT Heather Borachok or AEMT Jody C. Winch to draw defendant’s blood. He testified that there was no risk to defendant in having his blood drawn.
AEMT Borachok testified that P.A. Parker and R.N. Sweeney told her to draw defendant’s blood for the police; that she obtained a small amount of blood from defendant, but the flow stopped before she had enough; and that AEMT Winch then performed a second successful blood draw.
AEMT Jody Winch testified that he is a “graduate nurse”; that he planned to take “boards” on September 10th; and that if he passes he will become an R.N.; that he is licensed as a licensed practical nurse, but was employed at the Lake Placid emergency room as an AEMT. He also testified that he drew the blood sample for the police after AEMT Borachok had made an unsuccessful attempt to draw the blood and that he did not have any conversation with Dr. Pond regarding the blood draw.
This court finds from the testimony presented at the August 22, 2002 hearing that either P.A. Parker or R.N. Sweeney or both authorized the blood draw and that no physician authorized that procedure.
The Court of Appeals in People v Moser (70 NY2d 476, 478 [1987]) discussed the reason for the physician supervision requirement as follows: “the personal supervision of a physician is an important safeguard for the health of the suspects to be tested.” However, the Court determined that the physician was not required “to watch the technician perform the procedure” (id.). The Court of Appeals held that: “In our view, the concerns addressed by the supervision requirement are adequately served by the physician’s authorization of the test, which presumably reflects his medical judgment that it will not put the patient at risk, and his presence to respond to inquiries and emergencies.” (Id. at 478.)
*702 The Appellate Division, Fourth Department, has held that the supervision and direction of an R.N. is not an adequate substitute for the supervision and direction of a physician. (People v Ebner, 195 AD2d 1006 [4th Dept 1993].)
The Ebner Court held that the results of the blood test must be suppressed because “[t]here was no showing that a physician had reached a ‘medical judgment’ that drawing blood would not put defendant, who was seriously injured, at risk or that a physician was present ‘to respond to inquiries and emergencies.’ ” (Id. at 1007, quoting People v Moser, supra; accord People v Olmstead, 233 AD2d 837, 837 [4th Dept 1996] [“The critical element, deemed essential by the Legislature when it amended the statute in 1969 (see L 1969, ch 669, § 1) is that a physician authorize the taking of the sample (see People v Moser, supra)”].)
The People did not meet their burden of showing that a physician either directed or supervised the taking of a blood sample from defendant by an AEMT. The blood test results should, therefore, be suppressed.
Defendant’s argument that his blood was taken in violation of the physician-patient privilege is moot because the test results are suppressed. That argument is without merit in any event. (See, e.g. People v Hagin, 238 AD2d 714 [3d Dept 1997], lv denied 90 NY2d 894 [1997] [registered nurse had statutory authority to draw blood for purpose of determining alcoholic content].)
Hearings
a. Statement Suppression — Huntley /Dunaway Hearing
The People notified the defendant, pursuant to CPL 710.30, of their intent to offer evidence at the trial of oral and/or written statements made to a public servant pertaining to the charges set forth in the indictment. The defendant requests a Huntley hearing to determine the voluntariness of defendant’s statements and an order suppressing the statements. The People consented to a Huntley hearing in their affirmation in opposition, filed June 4, 2002.
The defendant should be granted a Huntley hearing pursuant to CPL 710.60 (4), to be scheduled by the clerk of the court.
The defendant also requests a Dunaway (Dunaway v New York, 442 US 200 [1979]) hearing to determine whether defendant’s statements should be suppressed as the fruits of an arrest without probable cause. Defendant does not make *703 specific sworn allegations of fact that defendant’s statements were the fruits of an arrest without probable cause or even that the statements were made after defendant was arrested or detained.
However, it is well settled that a defendant in a hearing on a motion to suppress defendant’s postarrest statement should be allowed to “delve fully into the circumstances attendant upon his arrest.” (People v Whitaker, 79 AD2d 668, 669 [2d Dept 1980]; see also People v Misuis, 47 NY2d 979 [1979]; People v Specks, 77 AD2d 669 [2d Dept 1980].)
The defendant should be permitted to inquire into the lawfulness of any detention of the defendant prior to the making of any statements regarding the alleged crimes.
b. Bad Acts/Criminal Convictions — Sandoval Hearing
The defendant has requested an order restricting the People’s use of evidence of defendant’s prior bad acts or criminal convictions, if any, to impeach the defendant, if the defendant testifies at trial.
Immediately prior to the commencement of jury selection, the People shall, upon request of the defendant pursuant to CPL 240.43, notify the defendant of all specific instances of the defendant’s prior criminal convictions and uncharged criminal, vicious or immoral conduct of which the People have knowledge and which the People intend to use at trial for the purpose of impeaching the credibility of the defendant. Thereafter, on defendant’s motion, a Sandoval hearing shall be conducted by the court prior to the commencement of trial.
c. Ventimiglia /Molineux
The defendant’s request for a ruling on the admissibility of evidence on the People’s direct case that the defendant committed other uncharged crimes is premature, and should, therefore, be denied. The People have not given notice that they intend to offer evidence of uncharged crimes on their direct case. If they intend to offer that evidence on their direct case, they should request a Ventimiglia hearing prior to the commencement of trial. (People v Ventimiglia, 52 NY2d 350 [1981]; People v Heath, 175 AD2d 562 [4th Dept 1991]; People v Molineux, 168 NY 264 [1901].)
d. Frye/Daubert Hearing
Defendant requests that the People be required to identify the experts they intend to call at trial concerning the cause of death of Mr. Shea, “information concerning accident reconstruction and crush tests,” the qualifications of the People’s experts, *704 the basis for the proposed testimony, the substance of the facts they relied upon, and a summary of the grounds for each expert’s opinion. The defendant requests that thereafter a Frye or Daubert (Daubert v Merrell Dow Pharms., Inc., 509 US 579 [1993]) hearing be held.
The People are required to disclose reports of their accident reconstruction expert and any written report or document concerning any crush tests performed on the vehicles involved in the accident in this case. (CPL 240.20 [1] [c].)
The People provided copies of the accident reconstruction reports of State Police Investigator Allen V. Wright and the New York State Police Troop C Collision Reconstruction Unit to defendant in their response to defendant’s demand for discovery, dated May 1, 2002. Those reports identify the People’s accident reconstruction expert as Investigator Allen V. Wright. They also contain reference to the evidence used to reconstruct the accident and describe the procedures used in the reconstruction.
Investigator Wright’s report describes the scene of the collision of the vehicles driven by the defendant and the victim, the evidence collected at the scene, the results of examination of the vehicles, the results of examination of occupant restraints, an analysis of occupant injury patterns and occupant kinematics, the results of a crush examination and a lamp examination, diagrams, findings and conclusions.
The Troop C Collision Reconstruction Unit report includes information regarding the vehicles’ weights and dimensions, a collision scene diagram, National Highway Traffic Safety Administration recall databases for both vehicles, front end stiffness coefficients for the victim’s vehicle, photographs of the involved vehicles, data from the sensing and diagnostic module of the victim’s vehicle, and the results of a determination of the change in speed of the vehicles at the time of the collision based on damage deformation using the Win crash ii computer program.
Police officers may render opinions relating to the reconstruction of accident scenes when they are found to be qualified by training and experience. (See generally People v Battease, 124 AD2d 807 [2d Dept 1986].)
The expert testimony admissibility test established in Frye v United States (293 F 1013 [1923]) requires that expert testimony be based on a scientific principle or procedure which has been “sufficiently established to have gained general accep *705 tance in the particular field, in which it belongs.” (People v Wesley, 83 NY2d 417, 423, quoting Frye v United States, supra at 1014.)
The New York Court of Appeals in Wesley reaffirmed in 1994 that the Frye test is still the relevant test in New York rather than the Federal Daubert test. (See Daubert v Merrell Dow Pharms., Inc., supra.)
The Frye test relates to “novel scientific theories, methodologies or tests.” It applies only when a party seeks to present that type of evidence at trial. (People v Wernick, 89 NY2d 111 [2001].) Novel scientific evidence is admissible under the Frye test if the scientific theory upon which the evidence is based is generally accepted in the scientific community.
The testimony of accident reconstruction experts has been admitted in New York courts for many years. (See People v Moore, 155 AD2d 725 [3d Dept 1989] [County Court did not err in admitting the testimony of the People’s accident reconstruction expert regarding the preimpact and postimpact speeds of the two vehicles based upon his training in accident reconstruction, his experience as a State Trooper in investigating over 1,000 accidents and his experience in reconstructing 75 to 100 collisions]; People v Battease, 124 AD2d 807 [3d Dept 1986]; People v Carkner, 213 AD2d 735 [3d Dept 1995], lv denied 85 NY2d 970 [1995]; People v Kenny, 175 AD2d 404 [3d Dept 1991], lv denied 78 NY2d 1012 [1991].)
The accident reconstruction reports in the instant case are based upon observations, measurements, vehicle data, photographs and mathematical analysis based upon the well established laws of physics. These techniques have been used and tested in court for many years.
A Frye hearing is not required to determine the admissibility of accident reconstruction testimony because it is based upon the laws of physics and mathematical calculations neither of which are “novel.” They are well established and generally accepted within the scientific community. Accident reconstruction testimony is relevant to the issues in this case. It has been found to be reliable and it may be helpful to the jury in their evaluation of the evidence in this case. Accident reconstruction evidence may be admitted in this case provided that the People establish the expert’s qualifications and present the proper foundation for his testimony.
The defendant will have an opportunity to cross-examine the People’s accident reconstruction expert at the trial concerning *706 his qualifications, measurements and testing methods. That cross-examination may affect the weight which the jury will give to the accident reconstruction evidence.
The physician who signed the victim’s death certificate should also be permitted to testify regarding the cause of the victim’s death. The scientific principles supporting autopsies and a physician’s determination of cause of death are well established and accepted in the medical community. A Frye hearing regarding the acceptance of these principles and procedures in the medical community is not necessary in this case.
The branch of defendant’s motion which requests Frye or Daubert hearings should, therefore, be denied,
e. Discovery
The defendant requests an order directing the People to provide the victim’s medical records to defendant for inspection and copying.
Defendant’s demand for discovery, dated April 22, 2001, included the following demand:
“Copies of all medical records, including the auto-posy [sic] report, concerning the decedent’s care at the Adirondack Medical Center January 21-22, 2002, including but not limited to complete and executed medical authorization forms, granting defendant’s attorney to receive such records upon presentation to the appopriate ¡szc] health/medical care providers.”
The People in their response to defendant’s demand for discovery responded “See attached medical reports.”
The medical records attached to the People’s response were copies of the following records of the Lake Placid Volunteer Ambulance Service:
(A) Prehospital care report relating to the defendant’s treatment at the scene and before his arrival at Adirondack Medical Center emergency room in Lake Placid, New York.
(B) Prehospital care report relating to the victim’s treatment at the scene and before his arrival at the Adirondack Medical Center emergency room in Lake Placid.
(C) Prehospital care report relating to the victim’s care during his movement by ambulance from the Lake Placid emergency room to the Saranac Lake Hospital.
The People did not refuse defendant’s demand or respond to the demand in any other way in their affirmation in opposition. *707 Defendant renewed his demand for the victim’s “entire medical file” in his attorney’s reply affidavit, dated June 17, 2002, on the grounds that the People did not refuse his demand for additional discovery or oppose his motion for an order directing additional discovery. Defendant also renewed his motion for discovery of the medical records in his supplemental affirmation in support of omnibus motion, dated July 2, 2002, on the grounds that the People did not refuse the demand or oppose the motion.
CPL 240.40 (1) (b) provides that the court “must, unless it is satisfied that the people have shown good cause why such an order should not be issued, order discovery or any other order authorized by subdivision one of section 240.70 as to any material not disclosed upon demand pursuant to section 240.20 where the prosecutor has failed to serve a timely written refusal pursuant to section 240.35.”
CPL 240.80 (3) provides that “[a]bsent a refusal to comply with a demand to produce, compliance with such demand shall be made within fifteen days of the service of the demand or as soon thereafter as practicable.”
CPL 240.70 (1) provides that if “the court finds that a party has failed to comply with any of the provisions of this article, the court may order such party to permit discovery of the property not previously disclosed, grant a continuance, issue a protective order, prohibit the introduction of certain evidence or the calling of certain witnesses or take any other appropriate action.”
Counts one and two of the indictment charge the defendant with vehicular manslaughter in the second degree and criminally negligent homicide. Each of these charges contains an element that the defendant caused the death of the victim. Witness statements indicate that the victim was conscious, alert, and responsive after the accident. He did not succumb to his injuries until approximately seven hours after the accident, during which time he was treated at the emergency room in Lake Placid and at the Adirondack Medical Center Hospital in Saranac Lake. The victim’s medical record and autopsy report are relevant and material to the element of the cause of the victim’s death.
In People v Preston (13 Misc 2d 802 [Kings County Ct 1958]), the court held that a defendant charged with manslaughter was entitled to examine and copy the hospital records and medical examiner’s report regarding the cause of the victim’s death.
*708 In People v Christiano (53 Misc 2d 433 [Westchester County Ct 1967]), the defendant was charged with driving while intoxicated and vehicular homicide. The victim was injured in an accident with defendant and died 17 days later. The court held that defendant was entitled to discovery and inspection of the decedent’s medical records. The court also noted that the defendant, in the interests of justice and to avoid delay at the trial, should be given the opportunity to examine the evidence where it is of such a nature as to require lengthy examination by experts to determine whether it is favorable to the defendant. (Id. at 434-435, citing People v Carothers, 24 Misc 2d 734 [Orange County Ct 1960].)
In People v Wilson (17 Misc 2d 349 [Monroe County Ct 1959]), the court granted the defendant’s motion to inspect and copy the victim’s hospital records where the murder victim lived for 20 days after allegedly being struck by defendant with a metal pipe.
Preston, Christiano, and Wilson were all decided based upon fundamental fairness principles prior to the enactment of the current discovery statute.
The Appellate Division in People v Bugayong (182 AD2d 450 [1st Dept 1992]) held that the hospital records of the alleged victim of defendant’s sexual attacks at a hospital where he was employed as a nurse should have been made available to defendant. The Court reversed the defendant’s conviction even though the trial court had examined the medical records in camera and supplied some information to defendant. The Court (at 451) found that there was “material in the records which could arguably have provided some assistance to the defense.”
This court concludes that, as a matter of fundamental fairness, defendant should be permitted to inspect and copy the records of the victim’s medical treatment from the time of the accident until his death and the autopsy report. This court also bases this decision on the independent ground that the People failed to respond to defendant’s discovery demand or oppose defendant’s motion for discovery of the alleged victim’s medical records and autopsy report.
By reason of the foregoing, it is hereby ordered that the defendant’s motion for the court to inspect the grand jury minutes is hereby granted, and upon inspection, the defendant’s motion for the release of the grand jury minutes is denied, and it is further ordered that the clerk shall schedule a combined Huntley /Dunaway hearing, and it is further ordered that a Sandoval hearing shall be conducted by the court immediately *709 prior to jury selection, and it is further ordered that the People are directed to make the alleged victim’s medical records from the time of the accident until his death and/or the autopsy report available to the defendant forthwith for inspection and copying, if the People have possession of the record and/or report, and it is further ordered that if the People do not have possession of the medical records and/or the autopsy report, but the records and/or report are within their control and they intend to offer the record and/or report at trial, that they make the record and/or report available to the defendant for inspection and copying within 10 days of the date of this decision and order, and it is further ordered that the defendant’s motion regarding Indictment No. 02-019 is, in all other respects, denied.