# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: January 25, 2016

**NO. 33,425**

**STATE OF NEW MEXICO,**

Plaintiff-Appellant,

v.

**LUIS ALFREDO GARCIA,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Fernando R. Macias, District Judge**

Hector H. Balderas, Attorney General
Yvonne M. Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellant

Jorge A. Alvarado, Chief Public Defender
Karl Erich Martell, Assistant Appellate Defender
Santa Fe, NM

for Appellee

# OPINION

**VIGIL, Chief Judge.**

{1}     The question presented in this case is whether an emergency medical technician (EMT) is authorized to draw blood for the purpose of determining its alcohol or drug content under the Implied Consent Act, NMSA 1978, Sections 66-8-105 to -112, (1978, as amended through 2015). We conclude no such authority exists and affirm the order of the district court suppressing the results of Defendant's blood test.

## I.    BACKGROUND

{2}     State Police Officers Bernal and Robles were dispatched to a head-on collision on NM 404 near the Texas border. Officer Bernal encountered the two cars involved in the accident, and his on-scene investigation indicated that Defendant crossed over the centerline and struck the other vehicle, causing its occupants serious injuries. Bernal interviewed Defendant at the scene and observed that Defendant had blood-shot, watery eyes, smelled of marijuana, and demonstrated indicators of being under the influence of marijuana. Officer Bernal asked Defendant if he had smoked marijuana, which he denied. Officer Bernal placed Defendant under arrest for driving while intoxicated, and read the Implied Consent Act advisory to Defendant. Defendant consented to a blood draw.

{3} Defendant, who was also injured in the accident, was placed inside an ambulance for transport to a trauma center in El Paso, Texas. Defendant was being treated by EMT Denise Andavazo inside the ambulance and while she was getting ready to administer Defendant an intravenous (IV) solution, Officer Robles asked her to draw a blood sample from Defendant, and she agreed.

{4} Officer Robles gave Ms. Andavazo an unexpired Scientific Laboratory Division (SLD) approved blood draw kit to do the blood draw. SLD-approved blood draw kits include everything that is needed for a blood draw to ensure continuity and standardization, and to avoid compromising the accuracy and integrity of blood samples. The kits contain instructions, paperwork, an iodine cleaning pad, a needle with attached tube, and two gray-topped, sterile vacuum tubes containing sodium fluoride—a white powder preservative.

{5} To avoid compromising Defendant's care, which was her first priority, Ms. Andavazo did not read the instructions, and she did not use the needle with attached tube provided in the SLD-approved kit. Instead, she used a sterile IV catheter from the ambulance's supply to puncture Defendant's vein and a sterile syringe from the ambulance's supply to draw Defendant's blood through the IV catheter and then transferred Defendant's blood sample to the two vacuum tubes in the SLD-approved kit. Ms. Andavazo then connected the IV to Defendant and the ambulance transferred

him to the hospital. Ms. Andavazo did not use the needle from the SLD-approved kit to puncture Defendant, because this would have required her to puncture Defendant twice, which she wanted to avoid. SLD received the sample, and after analyzing it, concluded that THC metabolites, related to the "high" marijuana produces, were present in Defendant's blood, but not alcohol.

{6} Defendant was charged by indictment with causing great bodily harm by vehicle while driving under the influence of alcohol and drugs and failure to maintain a traffic lane.

{7} Defendant filed a motion to suppress the results of the blood test on grounds that Ms. Andavazo was not qualified to perform blood draws under NMSA 1978, Section 66-8-103 (1978) and that the blood draw was improperly performed. Following a second evidentiary hearing, the district court granted the motion to suppress on both grounds. The State appeals.

## II.    ANALYSIS

### A.    Standard of Review

{8} "We review rulings upon the admission or exclusion of evidence under an abuse of discretion standard, but when there is no evidence that necessary foundational requirements are met, an abuse of discretion occurs." *State v. Gardner*, 1998-NMCA-160, ¶ 5, 126 N.M. 125, 967 P.2d 465 (citation omitted). This case

3

requires us to engage in statutory interpretation to determine what the appropriate foundation is for admitting the results of blood tests to determine the content of alcohol or drugs under the Implied Consent Act. We do so under a de novo standard of review. *State v. Bowden*, 2010-NMCA-070, ¶ 9, 148 N.M. 850, 242 P.3d 417.

**B.      Qualifications Under Section 66-8-103**

{9}      The Implied Consent Act states that "[o]nly the persons authorized by Section 66-8-103. . . shall withdraw blood from any person for the purpose of determining its alcohol or drug content." Section 66-8-109(A). Section 66-8-103 in relevant part then directs:

> Only a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test.

In interpreting Section 66-8-103, we follow standard statutory interpretation principles. The primary goal of statutory interpretation is "to ascertain legislative intent, indicated by the plain language of the statute." *State v. Vaughn*, 2005-NMCA-076, ¶ 33, 137 N.M. 674, 114 P.3d 354. "When the statute's language is clear and unambiguous, we give the statute its plain and ordinary meaning and refrain from further interpretation." *Id.* (internal quotation marks and citation omitted). "All portions of statutes are read in connection with every other part to produce a harmonious whole." *Id.*

{10}     The State first argues that because Section 66-8-103 only refers to a "blood-alcohol test," it does not apply here as this case involves a blood test which was used to determine the presence of drugs. However, this argument overlooks the plain language of Section 66-8-109(A), which makes it clear that only the persons authorized by Section 66-8-103 "shall withdraw blood from any person for the purpose of determining its alcohol or drug content." In reading these sections together, we conclude that the Legislature intended blood draws under the Implied Consent Act—whether for alcohol or drug content—be performed only by persons listed in Section 66-8-103.We therefore reject the State's argument, and turn to the question presented—whether an EMT falls within the parameters of Section 66-8-103.

{11}     Section 66-8-103 explicitly states that "only" the categories of persons listed may perform blood draws under the Implied Consent Act. The categories are: (1) a physician; (2) a licensed professional or practical nurse; (3) a laboratory technician; and (4) a technologist. The State argues that there is a fifth category: a "licensed professional", and as a licensed EMT, Ms. Andavazo is a "licensed professional" authorized to perform a blood draw under Section 66-8-103. To answer this contention, we first look to our own cases construing the statute.

5

{12}     In *State v. Trujillo*, 1973-NMCA-076, ¶¶ 2-3, 15-16, 85 N.M. 208, 510 P.2d 1079, the defendant was arrested for driving while intoxicated and taken to a hospital where a laboratory technologist who was employed by a physician, but not licensed, withdrew his blood in a medically approved manner. The defendant argued that the statute[1] identifies five authorized categories: (1) a physician; (2) a licensed professional nurse; (3) a licensed practical nurse; (4) a laboratory technician; and (5) a laboratory technologist. *Trujillo*, 1973-NMCA-076, ¶ 16. The defendant further asserted that the licensing requirement set forth in the statute applies to a laboratory technician and a laboratory technologist. *Id*. We first noted that the statute is ambiguous, requiring us to ascertain the legislative intent by applying rules of statutory construction. *Id.* ¶ 17. We then rejected the argument that the licensing requirement stated in the statute applies to a laboratory technologist on the basis that there was no provision in effect for licensing technologists when the statute (Section 66-8-103) was enacted. *Trujillo*, 1973-NMCA-076, ¶¶ 18-20, 22. Reading a licensing requirement into the statute when there were no other provisions to allow for licensing would lead to an otherwise absurd or unreasonable result. *Id.* ¶ 19.

{13}     In *State v. Wiberg*, 1988-NMCA-022, ¶ 10, 107 N.M. 152, 754 P.2d 529, we stated that "[s]tatutes are to be read and understood primarily according to their

---

[1]NMSA 1953, Section 64-22-2.1 (1978) (recompiled as Section 66-8-103)

grammatical sense, unless it is apparent that the [Legislature] intended something different." We utilized the "last antecedent doctrine" to conclude that the phrase "employed by a hospital or physician" applied to the preceding phrase "laboratory technician or technologist" and not to "nurse," the more remote term, as the defendant contended. *Id.* ¶¶ 7, 11 (internal quotation marks and citation omitted). We therefore held, "Section 66-8-103 does not require a licensed professional nurse or registered nurse to be employed by a hospital or physician in order to withdraw blood for blood-alcohol tests." *Wiberg*, 1988-NMCA-022, ¶ 18.

{14} Finally, in *State v. Nez*, 2010-NMCA-092, ¶¶ 11, 13-14, 148 N.M. 914, 242 P.3d 481, we concluded that the evidence was sufficient to establish the blood drawer's identity in a hospital emergency room as a registered nurse, and therefore, that she was qualified to withdraw the defendant's blood under Section 66-8-103. While these cases are of some assistance to us, they are not definitive, and for additional assistance, we now turn to how other states have treated the question before us here.

{15} In *Andrews v. State ex rel. Department of Public Safety*, 2014 OK CIV APP 19, 320 P.3d 27 (cert. denied Jan 27, 2014), the arresting officer observed several indicators of intoxication while investigating a single car accident, and at his request, an EMT took the defendant's blood inside the ambulance. *Id.* ¶¶ 4-8. Like the New

Mexico statute, Oklahoma's specifies that "[o]nly" certain categories of individuals are qualified to withdraw blood to determine alcohol or other intoxicants. *Id.* ¶ 15. Because an EMT was not among those persons specifically listed in the statute to withdraw blood, the Oklahoma Court of Appeals concluded that the blood test results could not be used as evidence to revoke the defendant's driver's license. *Id*. ¶ 22.

{16} Similarly, in *People v. Reynolds*, 749 N.Y.S.2d 687, 690-91, (2002) (non-precedential), since the EMT was not acting "under the supervision and at the direction of a physician" when he withdrew the defendant's blood in the emergency room, as required by the applicable statute, the results were held not admissible in the defendant's trial for driving while intoxicated, vehicular manslaughter, and other charges.

{17} In *Bortnem v. Commissioner of Public Safety*, 610 N.W.2d 703, 704 (Minn. Ct. App. 2000), a police officer who received several hundred hours of training, including 100-200 blood draws, to obtain his state certification as an "emergency medical technician paramedic," withdrew the driver's blood at the police station following his arrest for DWI. Like our statute, the Minnesota statute states that "only" certain individuals may withdraw blood to determine the presence of alcohol or drugs, including a "physician's trained mobile intensive care paramedic." The court determined that the blood draw was not authorized because notwithstanding his

8

training and experience, the officer was not a paramedic as defined in the statute. *Id.* at 705-706.To conclude otherwise would require reading the words "physician's," "trained," "mobile", "intensive", and "care" out of the statute. *Id.*

{18}     We construe Section 66-8-103[3] in the same manner as the foregoing cases: according to the language used, according to their grammatical sense, and consistent with other existing statutes. A physician is clearly qualified under the statute. The phrase which follows refers to two types of nurses: a "licensed professional nurse" or a "licensed practical nurse." We arrive at this conclusion because the Nursing Practice Act, NMSA 1978, §§ 61-3-1 to -31(1968, as amended through 2014), has these two classes of nurses. A registered nurse is a "licensed professional nurse." Such an individual is a nurse who "practices professional registered nursing" and is entered in the "register of licensed nurses." Section 61-3-3(N), (O) (defining "professional registered nursing" and "registered nurse"). In turn, a "licensed

---

[3]Section 66-8-103 in its entirety states:

Only a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test. No such physician, nurse, technician or technologist who withdraws blood from any person in the performance of a blood-alcohol test that has been directed by any police officer, or by any judicial or probation officer, shall be held liable in any civil or criminal action for assault, battery, false imprisonment or any conduct of any police officer, except for negligence, nor shall any person assisting in the performance of such a test, or any hospital wherein blood is withdrawn in the performance of such a test, be subject to civil or criminal liability for assault, battery, false imprisonment or any conduct of any police officer, except for negligence.

practical nurse" is "a nurse who practices licensed practical nursing" and is entered in the "register of licensed practical nurses." Section 61-3-3(I), (J) (defining "licensed practical nurse" and "licensed practical nursing").These two classes are followed by "or" to refer to two additional categories: a "laboratory technician, or technologist employed by a hospital or physician." Section 66-8-103. Because we have found no applicable separate statutory definition for a "laboratory technician" and given the structure of the phrase, it appears that a laboratory technician must be employed by a hospital or physician to qualify. However, that question is not before us in this case.

{19}     We therefore conclude that Section 66-8-103 sets forth the only five categories of individuals authorized to withdraw blood pursuant to the Implied Consent Act: (1) a physician; (2) a licensed professional nurse; (3) a licensed practical nurse; (4) a laboratory technician (who must be employed by a hospital or physician); and (5) a technologist (who must be employed by a hospital or physician).There is no separate category of a "licensed professional," as urged by the State. Our conclusion is buttressed by the second sentence of Section 66-8-103, which refers to "such physician, nurse, technician or technologist" as being exempt from certain criminal and civil liabilities. This sentence tells us that the Legislature was referring only to these categories and that it did not intend to include a "licensed professional." We therefore hold that a "licensed professional" is not a separate category of individual

10

authorized to draw a blood sample for alcohol or drug content under the Implied Consent Act, and since Ms. Andavazo does not satisfy any of the categories that are listed as the "only" ones qualified to draw blood samples she is not qualified under the Implied Consent Act.

{20}    Even if we were able to accept the State's argument for a separate category of a "licensed professional," Ms. Andavazo's license as an EMT does not qualify her to draw blood to determine its alcohol or drug content under the Implied Consent Act. Ms. Andavazo is employed by American Medical Response (AMR), an ambulance company licensed by the State of New Mexico. AMR is approved by the Department of Health as a "certified emergency medical service" under the Emergency Medical Services Act, NMSA 1978, Sections 24-10B-1 to -7 (1983, as amended through 2014). *See* §§ 24-10B-3(E), (F), and (H) (defining "certified emergency medical service" in pertinent part as an organization approved by the Department of Health to provide "emergency services"). The Emergency Medical Services Act in turn defines "emergency medical services" as "the services rendered by providers in response to an individual's need for immediate medical care to prevent loss of life or aggravation of physical or psychological illness or injury." Section 24-10B-3(K).

{21}    Within this statutory framework, Ms. Andavazo is licensed by the Department of Health to provide "emergency medical services" as an "emergency medical

technician," that is, "a provider who has been licensed by the department to provide patient care." Section 24-10B-3(N), -5(A) (providing that the Department of Health shall adopt licensure requirements "for all persons who provide emergency medical services within the state"). Specifically, Ms. Andavazo is certified as an EMT-Intermediate (EMT-I) by the Department of Health. As such, she is allowed to perform various skills, techniques, and procedures, and to administer medications, with "medical director approval," all of which "are considered advanced life support." 7.27.11.8(C) NMAC (8/14/2014).[2] One of the procedures Ms. Andavazo is allowed to perform with "medical director approval" is blood drawing. 7.27.11.8(M)(2)(a)(vii) NMAC.

{22}     The statutory and regulatory provisions therefore allow Ms. Andavazo to perform blood drawing, but only in the context of providing "emergency medical services" under the Emergency Medical Services Act; that is, services rendered "in response to an individual's need for immediate medical care to prevent loss of life or aggravation of physical or psychological illness or injury." Section 24-10B-3(K). Blood draws to determine the content of alcohol or drugs in blood under the Implied Consent Act do not fall under the scope of Ms. Andavazo's license as an EMT-I.

---

[2]In addition, it must be documented that the EMT "has been appropriately trained," and the EMS provider must have a signed authorization from the service's medical director on file at its headquarters or administrative offices.7.27.11.8(C) NMAC.

Moreover, her training as an EMT-I does not include the protocols for performing blood draws that comply with the Scientific Laboratory Division regulations of the Department of Health under the Implied Consent Act. Accordingly, Ms. Andavazo's EMT-I certification did not authorize her to draw blood for the purpose of determining its alcohol or drug content. *See Greaves v. N. Dakota State Highway Comm'r*, 432 N.W.2d 879, 882-83 (N.D. 1988) (concluding that an EMT-I who had authority to provide pre-hospital emergency care consistent with the skills possessed by an EMT-I, which included taking blood draws, did not include authority to withdraw blood for the purpose of determining its alcohol content).

{23}    A predicate for the admission of a blood test result in a DWI case is that the test be performed "pursuant to the Implied Consent Act." Section 66-8-110(A). The State failed to meet its burden of proving that Defendant's blood was drawn by a person authorized to do so under Section 66-8-103, and the results of the test are therefore inadmissible. *See Price v. State*, 498 S.E.2d 262, 263 (Ga. 1998) (stating that "[i]n order to admit results of a blood test showing a defendant's blood alcohol level, the state must prove that the blood was withdrawn by a "qualified" person under the applicable statute.)*; City of Salina v. Martin*, 849 P.2d 1010, 1011 (Kan. Ct. App. 1993) (affirming an order suppressing results of a blood test in a DWI prosecution because the state failed to satisfy its burden of proving that the person who withdrew

the defendant's blood was qualified to do so under the applicable statute); *Cavazos v. State*, 969 S.W.2d 454, 457 (Tex. App. 1998) (holding that results of a blood test in an intoxication manslaughter case were inadmissible because the state failed to meet its burden of proving that the blood was withdrawn by a person qualified to do so under the applicable statute).

{24}    In this case, Defendant's blood was drawn by a person who was not qualified to do so, and in accordance with our analysis, the district court properly suppressed the test results on this basis. Section 66-8-103 has a two-fold purpose: to insure the safety and protection of the person whose blood is drawn; and to insure the reliability of the sample. *See Steere Tank Lines, Inc. v. Rogers*, 1978-NMSC-049, ¶ 6, 91 N.M. 768, 581 P.2d 456. Compliance with Section 66-8-103 advances both of these purposes. In light of our holding, it is not necessary for us to address whether the test results were properly suppressed, because the protocols and contents of the SLD blood draw kit were not followed and used.

## III.    CONCLUSION

{25}    The order of the district court is affirmed.


{26}    **IT IS SO ORDERED.**


                                    _____

14

**MICHAEL E. VIGIL, Chief Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY Judge**

_____

**M. MONICA ZAMORA, Judge**