The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: **February 25, 2026**

**No. A-1-CA-41442**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**STEPHEN CHARLES BAILEY,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett Loveless, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Tyler Sciara, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**DUFFY, Judge.**

{1}     Defendant Stephen Charles Bailey appeals his conviction for driving while intoxicated (DWI), contrary to NMSA 1978, Section 66-8-102(A) (2016), arguing that the results of his blood-alcohol test should have been excluded at trial because the phlebotomist who drew his blood was not authorized to do so under the Implied Consent Act, NMSA 1978, §§ 66-8-105 to -112 (1978, as amended through 2025). Defendant contends the phlebotomist, who owned and operated her own phlebotomy business, did not satisfy the statutory requirement of being "employed by a hospital or physician." *See* § 66-8-103 (1967, amended 2025)[1] ("Only a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test."). Under the facts and circumstances presented in this case, we agree. Because Defendant's blood was not drawn by a person authorized to do so under Section 66-8-103, the results of the test are inadmissible. And because the admission of the results at trial prejudiced Defendant, we reverse his conviction on this ground and remand for a new trial.

---

[1]The Legislature amended Section 66-8-103 in the 2025 Legislative Session, and the amendment took effect on June 20, 2025. This case concerns the pre-2025 version of the statute and all citations in this opinion refer to the version of Section 66-8-103 adopted in 1978, which remained in effect until the 2025 amendment.

{2}    Defendant additionally challenges the district court's authority to suspend his sentence and impose a term of probation because, at the time of sentencing, Defendant had already spent more time in pretrial custody than the maximum sentence allowed by statute. This issue is moot, and we decline to reach the merits in this appeal.

**BACKGROUND**

{3}    In May 2021, Defendant was driving a tow truck in Albuquerque with a friend riding along in the passenger seat. After stopping at a gas station, the passenger either jumped or fell out of the passenger side door as Defendant was making a right turn out of the gas station. The passenger was run over by the rear wheels of the tow truck and died from his injuries. Defendant kept driving, but was stopped by a Bernalillo County Sheriff's deputy shortly thereafter. When the deputy approached the driver's side door of the tow truck, he noticed that Defendant had bloodshot and watery eyes, slurred speech, and smelled of alcohol. After conducting standardized field sobriety tests, the deputy arrested Defendant.

{4}    Law enforcement obtained a warrant for a blood sample and transported Defendant to Lovelace Hospital, where Kim Shelby, a phlebotomist, drew Defendant's blood for testing. The results of the test showed that Defendant's blood alcohol content (BAC) was 0.21g/100ml. The State charged Defendant with one count of homicide by vehicle (DWI), contrary to NMSA 1978, Section 66-8-101(A),

(C) (2016), and one count of knowingly leaving the scene of an accident resulting in great bodily harm or death, contrary to NMSA 1978, Section 66-7-201(A), (B) (1989).

{5}     Defendant moved to suppress the blood test results on the ground that Shelby was not authorized to draw blood because she was not "employed by a hospital or physician," as required by Section 66-8-103. During an evidentiary hearing on Defendant's motion, Shelby testified that she has owned her own phlebotomy business, Quick Draw LLC, since 2008 and has worked as a phlebotomist since 1993. Shelby is the only phlebotomist performing blood draws for Quick Draw. Quick Draw contracts with law enforcement agencies to perform blood draws for DWI investigations.

{6}     Quick Draw entered into a professional services agreement with the University of New Mexico Health Sciences Center (UNMHSC), which called for UNMHSC to provide a physician to serve as medical director for Quick Draw. The agreement stated that the medical director's duties include overseeing the medical components of Quick Draw, developing and approving medical protocols, and being available to Quick Draw staff for questions related to medical direction. Quick Draw pays UNMHSC quarterly for the directorship.

{7}     In 2017, Dr. Darren Braude became medical director of Quick Draw, replacing a previous doctor who had served as medical director from 2007-2017. In

response to defense counsel's questioning, Shelby stated she does not work for and was not employed by Dr. Braude, but that Dr. Braude worked for her. Shelby also stated that Dr. Braude does not supervise her blood draws, and she does not speak with Dr. Braude unless she has questions. In a second hearing on the motion, defense counsel introduced billing statements showing that, dating back to July 2019, Dr. Braude had not billed Quick Draw for any hours or services.

{8}     Shelby was also asked about her relationship to Lovelace Hospital. Shelby answered that she was not employed by Lovelace or any hospital. According to Shelby, Lovelace does not allow its nurses to perform blood draws for DWI investigations, and she goes into local hospitals for that purpose. Shelby stated that she receives permission from local hospitals to draw blood by advising the staff that she is with law enforcement, and that officers stay with her while she performs the blood draw.

{9}     The district court entered a detailed order denying Defendant's motion to suppress. The court found that Shelby was employed by a hospital or physician for the purpose of performing blood draws for DWI investigations, though the district court did not specify which entity or person employed Shelby. The court concluded that "Lovelace Hospital in Downtown Albuquerque entrusts Ms. Shelby to enter into their facility to perform the blood draws," and that Shelby's "working relationship

with both Dr. Braude and the Hospital achieves the Legislative goal of protecting the patient and ensuring she collects reliable samples for criminal investigations."

{10} Defendant spent nearly two years in custody awaiting trial. The jury ultimately acquitted Defendant of leaving the scene of an accident and homicide by vehicle, but found Defendant guilty of the included offense of DWI (first). The district court sentenced Defendant to ninety days in the county jail, but suspended the sentence in full and placed Defendant on supervised probation for 364 days. The district court awarded 741 days of presentence confinement credit, but specified that "Defendant shall not receive pre-sentence confinement credit towards any period of probation." Defendant filed a motion to reconsider, arguing that because he had spent more time in pretrial custody than the statutory maximum sentence (ninety days), there was effectively no sentence of incarceration left to suspend, and consequently, the district court lacked jurisdiction to impose a sentence of probation. The district court denied Defendant's motion. Defendant appeals.

**DISCUSSION**

**I.    The Phlebotomist Was Not "Employed by a Hospital or Physician" Within the Meaning of Section 66-8-103**

{11} Defendant contends the district court erred in failing to exclude evidence of his BAC because Shelby was not authorized to perform blood draws under Section 66-8-103. "We review the district court's decision to exclude or admit evidence for

an abuse of discretion."[2] *State v. Warford*, 2022-NMCA-034, ¶ 10, 514 P.3d 31 (alterations, internal quotation marks, and citation omitted). "A court abuses its discretion if it applies an incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." *State v. Adams*, 2022-NMSC-008, ¶ 35, 503 P.3d 1130 (alteration, internal quotation marks, and citation omitted). "In determining whether the district court abused its discretion, we defer to the district court's findings of fact if substantial evidence exists to support those findings, but we review the application of the law to the facts de novo." *State v. Miera*, 2018-NMCA-020, ¶ 24, 413 P.3d 491. We likewise apply "a de novo

---

[2]The State notes that the denial of a motion to suppress evidence is typically reviewed as a mixed question of law and fact. *See State v. Yazzie*, 2016-NMSC-026, ¶ 15, 376 P.3d 858 ("Appellate review of a motion to suppress presents a mixed question of law and fact." (internal quotation marks and citation omitted)). But all recent blood draw cases have examined the issue under an abuse of discretion standard of review. *See, e.g.*, *State v. Adams*, 2022-NMSC-008, ¶ 35, 503 P.3d 1130; *State v. Warford*, 2022-NMCA-034, ¶ 10, 514 P.3d 31; *State v. Garcia*, 2016-NMCA-044, ¶ 8, 370 P.3d 791. This is because our Supreme Court has distinguished "the phrases 'motion to suppress' or 'suppress evidence'" as "terms of art which contemplate more than the simple exclusion of evidence. A motion to suppress presupposes that the evidence was *illegally obtained*" and "inadmissible because of the violation of a defendant's constitutional right." *City of Santa Fe v. Marquez*, 2012-NMSC-031, ¶ 27, 285 P.3d 637 (alterations, omission, internal quotation marks, and citation omitted). In this case, as in *Adams*, *Warford*, and *Garcia*, the district court was asked to determine whether the blood draw satisfied the requirements of the Implied Consent Act and not whether suppression of the blood alcohol evidence was required as a remedy for a violation of Defendant's constitutional rights. Accordingly, as with *Adams*, *Warford*, and *Garcia*, we apply an abuse of discretion standard to evaluate the district court's admission of the blood-alcohol results.

standard to review any interpretations of law underlying the evidentiary ruling." *State v. Garcia*, 2023-NMCA-010, ¶ 11, 523 P.3d 650 (internal quotation marks and citation omitted). To the extent we must interpret the Implied Consent Act, our review is de novo. *See Adams*, 2022-NMSC-008, ¶ 9.

**A.      Section 66-8-103 Requires That a Phlebotomist Be "Employed by a Hospital or Physician"**

{12}    "A predicate for the admission of a blood test result in a DWI case is that the test be performed 'pursuant to the Implied Consent Act.'" *State v. Garcia*, 2016-NMCA-044, ¶ 23, 370 P.3d 791 (quoting § 66-8-110(A)). The Implied Consent Act provides that "[o]nly the persons authorized by Section 66-8-103 . . . shall withdraw blood from any person for the purpose of determining its alcohol or drug content." Section 66-8-109(A). Turning to Section 66-8-103, "[o]nly a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test." Phlebotomists are "laboratory technician[s] within the meaning of Section 66-8-103" so long as they (1) have "adequate training and experience," and (2) are "employed by a hospital or physician." *Warford*, 2022-NMCA-034, ¶ 19.

{13}    In this case, the parties do not dispute that Shelby possesses the necessary training and experience to perform blood draws. The only question we must answer is whether Shelby was "employed by a hospital or physician," and in particular,

whether Shelby's relationship with either Lovelace or UNMHSC and Dr. Braude satisfies this requirement.

{14} To date, *Warford* is the only case to have examined what it means to be "employed" for purposes of the Implied Consent Act. In *Warford*, this Court considered whether a phlebotomist employed by TriCore, a contractor used by a hospital to perform blood draws, was "employed by a hospital." *Id.* ¶¶ 1, 7. The defendant argued that the phlebotomist must be *directly* employed by a hospital or physician to satisfy the employment requirement in Section 66-8-103. *Warford*, 2022-NMCA-034, ¶ 23. This Court disagreed, concluding that "the term 'employ' is ambiguous" and can mean "'to commission and entrust with the performance of certain acts or functions' in addition to its often-used meaning 'to hire.'" *Id.* ¶¶ 23-24 (quoting *Employ*, *Black's Law Dictionary* (11th ed. 2019)) (alterations omitted). Applying this meaning, the Court held that the phlebotomist was employed by a hospital because the hospital "entrusted her with the performance of blood draws during her shifts, even if [the hospital] did not hire her directly." *Id.* ¶ 25. The Court based its entrustment determination on evidence establishing that the hospital contracted with TriCore, which in turn hired the phlebotomist to work inside the hospital "to perform legal blood draws, trained her in blood-draw procedures, and determined she was qualified to perform blood draws, including legal blood-draw tests." *Id.*

**{15}** The Court in *Warford* concluded its analysis by examining its construction in light of the purposes of the Implied Consent Act, which are to "deter driving while intoxicated" and to "aid in discovering and removing from the highways the intoxicated driver." *State v. Trujillo*, 1973-NMCA-076, ¶ 21, 85 N.M. 208, 510 P.2d 1079 (internal quotation marks and citation omitted). Further, our Supreme Court has indicated that the Legislature's intended purpose for Section 66-8-103 "encompasses two goals: (1) to protect patients subject to a blood draw and (2) to ensure the collection of a reliable blood sample for use in DWI prosecutions." *Adams*, 2022-NMSC-008, ¶ 22. Given these purposes, our Supreme Court has indicated that Section 66-8-103 should be interpreted "to broaden, not narrow, the category of individuals authorized to draw blood." *Adams*, 2022-NMSC-008, ¶ 23; *see also State v. Wiberg*, 1988-NMCA-022, ¶ 13, 107 N.M. 152, 754 P.2d 529 (recognizing that narrowly construing Section 66-8-103 would "significantly and unnecessarily limit the classes of individuals who could assist in furthering the statute's legislative purpose"). In view of these overarching legislative goals, the *Warford* Court concluded that its assessment that the phlebotomist was an employee of the hospital under the circumstances was "consistent with the dual purposes of [Section 66-8-103]—i.e., ensuring the safety of [the d]efendant and ensuring the reliability of the blood test." *Warford*, 2022-NMCA-034, ¶ 26.

{16} Defendant urges us to apply additional criteria to evaluate the employment relationship, including whether a hospital or physician (1) directly or indirectly pays the technician, (2) directly or indirectly supervises the technician, and (3) exercises some authority over the technician. Our Supreme Court considered these same arguments in *State v. Johnson*, 2009-NMSC-049, 147 N.M. 177, 218 P.3d 863, a case that presented a close factual analogue to the employment circumstances in *Warford*. In *Johnson*, the defendant allegedly struck three private security guards on a high school campus and was charged with battery on school employees, contrary to NMSA 1978, Section 30-3-9(E) (1989). *Johnson*, 2009-NMSC-049, ¶ 1. The question presented was whether the security guards, who provided services at the school pursuant to a contract with the school board, were school employees. *Id.* ¶ 2. The Court of Appeals concluded the guards were not school employees based on "cases that analyze whether an employer-employee relationship exists by determining whether the employer had the right to control the details of the work to be performed by the employee." *Id.* ¶¶ 2, 6. The Supreme Court, however, declined to rely on "technical employment law" right to control tests. *See id.* ¶ 8 (internal quotation marks and citation omitted). The Court looked instead to the ordinary meaning of the term "employee," which "is one who provides services to another in exchange for compensation." *Id.* ¶ 12. Applying this definition, the Court concluded that an "employee" for purposes of Section 30-3-9 "includes those who have been

hired directly . . . in exchange for wages or a salary and, in some cases, those who provide services . . . in exchange for compensation, provided their services further the legislative purpose of [the statute]." *Johnson*, 2009-NMSC-049, ¶ 12. The Court determined that the security guards promoted "the State's articulated policy to make schools safe places for learning," and, based on both the plain language and purpose of the statute, concluded that "security guards providing services at a school pursuant to a contract with the school board are included within the definition of 'school employee' in Section 30-3-9." *Johnson*, 2009-NMSC-049, ¶ 17.

{17}    *Warford* and *Johnson* are congruent in their analysis in that both Courts looked to the ordinary meaning of the terms "employ" and "employee," and arrived at complementary conclusions—that an employee includes not only those who have been hired directly, but may also include, under certain circumstances, persons who are not directly employed. *Warford*, 2022-NMCA-034, ¶ 23; *Johnson*, 2009 NMSC-049, ¶ 12. We think it is appropriate to incorporate *Johnson*'s definition of "employee" into the criteria used to evaluate whether someone is "employed by a hospital or physician" under the Implied Consent Act. Thus, in light of *Johnson*, we agree with Defendant that the provision of services in exchange for compensation is a relevant consideration when evaluating whether the employment requirement in Section 66-8-103 is satisfied. *See Johnson*, 2009-NMSC-049, ¶ 12. Nonetheless, neither *Johnson* nor *Warford* relied on employment law principles of supervision

and control to define the employment relationship, and in both cases, an employment relationship was found to exist even without the sort of direct or indirect supervision and control Defendant advocates for. *See Warford*, 2022-NMCA-034, ¶ 25; *Johnson*, 2009-NMSC-049, ¶¶ 7-17. Consequently, while supervision and control may be relevant to the Section 66-8-103 analysis, we decline to hold that the absence of supervision and control is dispositive.

**{18}** With these principles in mind, we turn to address Shelby's relationships with Lovelace, UNMHSC, and Dr. Braude.

**B.  Lovelace Hospital**

**{19}** The district court concluded that "Lovelace Hospital in Downtown Albuquerque entrusts . . . Shelby to enter into their facility to perform the blood draws," and that such a relationship "achieves the Legislative goal of protecting the patient and ensuring she collects reliable samples for criminal investigations." Defendant maintains there is no evidence of an employment relationship between Lovelace and Shelby. The State contends that an entrustment-based employment relationship exists, similar to *Warford*.

**{20}** Shelby's relationship with Lovelace is readily distinguishable from the phlebotomist's relationship with the hospital in *Warford*. Lovelace does not contract with or employ Quick Draw in any capacity. Shelby did not perform blood draws *for Lovelace. Cf. Warford*, 2022-NMCA-034, ¶ 25 (noting that the laboratory placed

the phlebotomist at the hospital "to perform the hospital's blood draws"). Instead, as the district court found, *law enforcement* contracts with Quick Draw to perform blood draws for DWI investigations. Shelby does not work regularly inside Lovelace, and there is no evidence that Shelby received training in Lovelace's blood-draw procedures as an employee of Quick Draw. In short, there is simply no evidence in this case of the sort of relationship that allowed this Court to conclude the phlebotomist was employed (entrusted) by the hospital in *Warford*.

{21} We understand the State to argue that entrustment can be inferred from the following: (1) Shelby previously worked for Quest Labs at Lovelace Westside Hospital, (2) Lovelace does not allow its nurses to conduct blood draws for DWI investigations, and (3) local hospitals permit Shelby to enter their premises to perform blood draws for DWI investigations. None of these facts, individually or collectively, establish that Lovelace entrusted Shelby to perform blood draws.

{22} Shelby's previous employment with Quest, while relevant to her training and experience, *see Adams*, 2022-NMSC-008, ¶ 1, does not establish that Lovelace entrusted Shelby to perform blood draws after she left Quest—almost a decade before the blood draw in this case. Likewise, although the State contends that Lovelace does not permit its own nurses to draw blood,[3] this fact does not establish

---

[3]Shelby was not asked to provide a foundation for her testimony regarding Lovelace's policies and procedures in 2021, and no witness from Lovelace was called to testify about Lovelace's policies and procedures.

that Lovelace entrusted *Shelby* to perform blood draws. Finally, the State relies on Shelby's affirmative response when asked whether "local hospitals" permit her to enter and perform blood draws for law enforcement. This generalized statement does not establish that Shelby was permitted by *Lovelace*, specifically, to draw blood from patients in its facilities. Moreover, when asked on cross-examination what authorizes her to go into a hospital to draw blood, Shelby testified that she advises the nurse for the patient that she is there to draw blood for *law enforcement*, that she is their phlebotomist. Shelby did not testify specifically about how she gained access to Defendant at Lovelace. Even if we assume that she advised Defendant's nurse that she was there to draw blood for law enforcement, as was apparently her general practice, we are not persuaded that such a practice constitutes permission by Lovelace. *See Permission*, *Black's Law Dictionary* (12th ed. 2024) (defining "permission" as "[t]he act of permitting; the official act of allowing someone to do something" or "[a] license or liberty to do something; authorization"). Further, the State has not provided any argument as to why permission, even if it existed in this case, is tantamount to employment, particularly in the absence of other indicia of entrustment. *See Warford*, 2022-NMCA-034, ¶¶ 23-25; *Johnson*, 2009-NMSC-049, ¶¶ 12, 17.

{23}    For all of the foregoing reasons, we conclude the State's evidence does not establish that Lovelace "entrusts" Shelby, as the district court found. Accordingly,

because the facts of record do not demonstrate that Shelby was employed by Lovelace, we conclude the district court abused its discretion in finding that Lovelace employed Shelby for purposes of Section 66-8-103. *See State v. Samora*, 2016-NMSC-031, ¶ 37, 387 P.3d 230 (stating that an abuse of discretion occurs when an evidentiary ruling "is clearly against the logic and effect of the facts and circumstances of the case").

**C.    UNMHSC and Dr. Braude**

{24}    The State also submits that Shelby was employed by UNMHSC or Dr. Braude. The State's briefing on this point is sparse and relies heavily on Shelby's extensive training and experience. Even though Shelby has considerable experience, she is not authorized to draw blood under Section 66-8-103 unless she is also employed to do so by a hospital or physician. *See Adams*, 2022-NMSC-008, ¶¶ 1, 34. As we explain, Shelby's arrangement with UNMHSC and Dr. Braude does not satisfy Section 66-8-103's employment requirement.

{25}    Quick Draw is a single member LLC where Shelby is the owner and sole phlebotomist, meaning Shelby is self-employed. Through her business, she entered into a professional services agreement with UNMHSC to obtain the services of a physician to "perform the duties of a Medical Director as required by the New Mexico Statutes for Implied Consent." Considering there is no "medical director" requirement in the Implied Consent Act, it appears from the face of the agreement

that Shelby was seeking to comply with Section 66-8-103 by contracting with a hospital for the services of a physician.

{26}     The contractual arrangement between Quick Draw and UNMHSC, however, strongly supports Shelby's testimony that she is not employed by Dr. Braude, but instead, that Dr. Braude works for her. UNMHSC provides services to Quick Draw, namely, a medical director, in exchange for compensation. *See Johnson*, 2009-NMSC-049, ¶ 12 (stating that "an 'employee' is one who provides services to another in exchange for compensation"). Shelby pays UNM Medical Group quarterly for "services provided" under the professional services agreement, and Dr. Braude is able to bill Quick Draw for his time. The State presented no evidence that Shelby or Quick Draw provides any services to UNMHSC or Dr. Braude, and Shelby receives no compensation from them. Based on the employment structure described by Shelby and set forth in the professional services agreement, nothing about the contractual arrangement between Quick Draw, Shelby, UNMHSC, and Dr. Braude supports the conclusion that UNMHSC or Dr. Braude is Shelby's employer. *See id.*

{27}     During oral argument, the State argued that under *Warford*, this Court could conclude that Dr. Braude entrusted Shelby with performing blood draws because Dr. Braude agreed to serve as medical director for Quick Draw and signed Quick Draw's policies and procedures. According to the State, these acts signal Dr. Braude's approval of how Shelby was performing blood draws, which amounts to

entrustment. We are not persuaded that these nominal actions demonstrate an entrustment-type employment relationship similar to *Warford.*

{28} First, we cannot agree that Dr. Braude's acceptance of his role as Quick Draw's medical director is evidence of entrustment. The State would have us conclude, in essence, that Dr. Braude employed Shelby because he agreed to work for her. Putting aside the illogic of such a conclusion, we need only look to *Warford* to understand that entrustment entails more than merely contracting with someone. And unlike *Warford*, Dr. Braude and Shelby's working arrangement contains no indicia that Dr. Braude was functionally Shelby's employer. Dr. Braude did not hire, train, evaluate, or even work in the same location as Shelby, and there is no indication that she performed blood draws for Dr. Braude's practice. *Cf. Warford*, 2022-NMCA-034, ¶¶ 25-26. The State relies on the fact that Dr. Braude signed Quick Draw's venipuncture procedures, and thus approved of how Shelby was performing blood draws. But there is nothing in the record indicating that Dr. Braude ever observed Shelby perform a blood draw or otherwise had direct knowledge of how she performed blood draws in practice. Consequently, though Dr. Braude may have approved of Quick Draw's policies and procedures on paper, we cannot agree with the State's position that such approval extends to how Shelby was "going about performing these blood draws," and we cannot conclude that a mere review of a

company's policies and procedures is sufficient to establish entrustment-type employment.

{29} What is more, under the terms of the professional services agreement, Quick Draw, not UNMHSC or Dr. Braude, is responsible for ensuring that all phlebotomists are trained in accordance with state requirements. As both the owner of and the sole phlebotomist working for Quick Draw, Shelby was effectively responsible for her own training. And while the State argues that Dr. Braude "provides support for questions and issues that arise" and Shelby is able to confer with him "to ensure that her blood draws are in accordance with approved medical practices," the record does not show that either of these contingencies occurred. Shelby testified she never had an issue that required a call;[4] and from July 2019 through May 2022, Dr. Braude provided no billable hours to Quick Draw, demonstrating that for at least the two years prior to Defendant's blood draw and one year after, Shelby was responsible for ensuring her own compliance with approved medical practices. In sum, the State has not presented evidence of entrustment that would allow us to conclude that UNMHSC or Dr. Braude functioned directly or indirectly as Shelby's employer. *See Miera*, 2018-NMCA-020, ¶ 24.

---

[4] Shelby testified that she called Dr. Braude once with a question about whether a transfusion makes a difference in the draw, but did not specify when that call occurred.

**{30}** Lastly, we reject the State's contention that "narrowly defin[ing] 'employ' to exclude . . . Shelby and her business would undermine the Legislative goals and purpose behind the Implied Consent Act." Our holding honors and gives force to an express limitation the Legislature saw fit to impose—that laboratory technicians, including phlebotomists, must be employed by a hospital or physician in order to draw blood for purposes of the Implied Consent Act. *See* § 66-8-103. As Defendant observes, the Legislature chose to place this additional requirement on qualified medical professionals who are not otherwise licensed by the state. *Cf. Wiberg*, 1988-NMCA-022, ¶ 14 (holding that Section 66-8-103 does not require a licensed nurse to be employed by a hospital or physician and noting that "[t]he requirements to be a licensed professional nurse or registered nurse are sufficiently rigorous to fulfill the purpose of Section 66-8-103, that is, the safety of the subject and the reliability of the sample"). The employment requirement thus furthers the Legislature's two-fold purpose in enacting Section 66-8-103: ensuring the safety of the subject and the reliability of the sample. *See Adams*, 2022-NMSC-008, ¶ 20. Given this, we view both the statute's plain language and its purpose to support the conclusion that Section 66-8-103 does not authorize Shelby to draw blood for DWI investigations because neither she nor her business were employed to do so by a hospital or physician.

{31} For the foregoing reasons, we hold that the evidence does not establish that Shelby was employed, within the meaning of Section 66-8-103, by Lovelace, UNMHSC, or Dr. Braude at the time she drew Defendant's blood, and therefore we reverse the district court's contrary conclusion. *See Garcia*, 2016-NMCA-044, ¶ 8 (stating that "when there is no evidence that necessary foundational requirements are met, an abuse of discretion occurs" (internal quotation marks and citation omitted)). Because the State has not met its burden of proving that Defendant's "blood was drawn by a person authorized to do so under Section 66-8-103, . . . the results of the test are . . . inadmissible." *See Garcia*, 2016-NMCA-044, ¶ 23.

**D. The Error Was Not Harmless**

{32} In light of our holding, we must consider whether the error was harmless. *See State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110 ("Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful."); *State v. Salazar*, 2023-NMCA-026, ¶ 19, 527 P.3d 693 ("An erroneous evidentiary ruling is not grounds for a new trial unless the error was prejudicial rather than harmless." (internal quotation marks and citation omitted)). "[A] non-constitutional error is harmless when there is no reasonable *probability* the error affected the verdict." *Tollardo*, 2012-NMSC-008, ¶ 36 (internal quotation marks and citation omitted). "To determine the likely effect of the error, we must evaluate all of the circumstances, including, as relevant here, the importance of the [evidence] to

the prosecution's case, other evidence of the defendant's guilt to understand the role of the error within the context of the trial, and the cumulative nature of the error." *Salazar*, 2023-NMCA-026, ¶ 19. "Defendant bears the initial burden of demonstrating that he was prejudiced by the error." *State v. Astorga*, 2015-NMSC-007, ¶ 43, 343 P.3d 1245.

{33}     Defendant was convicted of DWI under the "impaired to the slightest degree" standard, which required the State to prove that "[D]efendant was under the influence of intoxicating liquor, that is, as a result of drinking liquor [D]efendant was less able to the slightest degree, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle a vehicle with safety to the person and the public." *See* § 66-8-102(A), (C)(1); UJI 14-4501(2) NMRA. Although evidence of Defendant's blood-alcohol content is not required to prove this charge, a defendant's "BAC remains relevant in cases where [DWI] is based on a defendant's impairment to the slightest degree" to show that the defendant had alcohol in their system "and, regardless of the numerical BAC, . . . to show that the defendant's poor driving was a result of drinking liquor." *State v. Franklin*, 2020-NMCA-016, ¶ 10, 460 P.3d 69 (internal quotation marks and citation omitted).

{34}     Defendant argues that the admission of his blood-alcohol content was prejudicial because the evidence featured heavily throughout the trial and the State, in closing argument, "encouraged the jury to rely on the blood evidence to find that

[Defendant] was impaired to the slightest degree." We agree. During trial, the State introduced evidence that Defendant's BAC was 0.21g/100ml, more than two and a half times the legal limit. The BAC evidence was not cumulative of other evidence admitted at trial, and the State placed significant emphasis on it. The State called two witnesses to testify at length regarding blood alcohol analysis and procedures, as well as the process of retrograde extrapolation to determine Defendant's BAC at the time of the accident. Additionally, two sheriff's deputies testified extensively about their department's procedures for obtaining a blood warrant, retrieving the blood evidence from the hospital, and delivering the blood kit to the substation where it is picked up for testing. As well, Shelby testified regarding her process for drawing blood and about performing the blood draw on Defendant.

{35} During closing argument, the State emphasized that when considering whether Defendant was impaired, the jury should take into account the "great deal of testimony about the blood results," in conjunction with other evidence of Defendant's intoxication, including body camera footage of the stop and Defendant's performance on the field sobriety tests. The State suggested that the jury should view the evidence collectively, but the prosecution referenced Defendant's blood alcohol results at least two more times during closing argument as proof that Defendant was highly impaired while driving. Given the substantial role the blood alcohol evidence played at trial and the State's reliance on that evidence to support

the DWI charge, there is a reasonable probability that the blood test results contributed to Defendant's conviction, even in the face of other evidence of impairment. Therefore, we conclude Defendant has met his initial burden of establishing prejudice. *See id.*; *Salazar*, 2023-NMCA-026, ¶ 20.

**{36}** The State did not address the harmfulness of the error or otherwise respond to Defendant's showing of prejudice. Accordingly, because Defendant made a showing of prejudice, and the State has not advanced any countervailing argument as to why the error can be viewed as harmless, we conclude the error was not harmless. *See Salazar*, 2023-NMCA-026, ¶ 23.

## II.    The Sentencing Issue is Moot

**{37}** Defendant additionally contends that his sentence was illegal. He argues that DWI carries a maximum sentence of ninety days for a first offense, and he was entitled to 741 of presentence confinement credit. *See* § 66-8-102(E). Defendant maintains that the district court was required to apply any presentence confinement credit to his sentence, and because he had already spent more time in pretrial custody than the statutory maximum sentence, the district court judge did not have authority to suspend his sentence and impose 365 days probation. *See id.*; *see also* NMSA 1978, § 31-20-3 (1985) (authorizing suspended sentences); *State v. Nieto*, 2013-NMCA-065, ¶¶ 5, 7-8, 303 P.3d 855 (discussing the interplay of presentence confinement credit, suspended sentences, and probation and holding that

presentence confinement credit "need not be credited against the probation time ordered by the district court").

{38} The parties acknowledge this issue is moot because Defendant has completed his sentence. *See McAneny v. Catechis*, 2023-NMCA-055, ¶ 24, 534 P.3d 1007 ("As a general matter a case is moot when no actual controversy exists and the court cannot grant relief to the parties."). Defendant invites us to apply a mootness exception on the basis that this case presents an issue of substantial public interest and is capable of repetition and likely to evade review. *See White v. Farris*, 2021-NMCA-014, ¶ 34, 485 P.3d 791. We acknowledge that both exceptions may be applicable in cases such as this. However, our review of moot cases is discretionary, and we decline to exercise our discretion to decide the issue in this case because neither party has addressed the issue in a manner that would allow us to render a decision on the merits of such a significant question. *See id.* Defendant provides some argument in support of his position, but he has not addressed the significant implications of a decision in his favor on the trial court's sentencing discretion or the potential collateral consequences of holding that a district court does not have authority to suspend a sentence when a defendant has spent more time in pretrial custody than the maximum statutory period of confinement. The State did not address the merits of the issue at all, arguing only that the issue is moot and should

not be reviewed. Based on the briefing, we decline to exercise our discretion to reach the merits of the sentencing issue in this case.

**CONCLUSION**

{39}   For the foregoing reasons, we reverse Defendant's conviction for driving while intoxicated. Because Defendant has not challenged the sufficiency of the evidence supporting his conviction, and because we are satisfied that substantial evidence supported his conviction, we remand for a new trial consistent with this opinion. *See State v. Revels*, 2025-NMSC-021, ¶ 21, 572 P.3d 974 (holding that double jeopardy does not bar retrial where appellate reversal is predicated "on any grounds other than evidentiary insufficiency").

{40}   **IT IS SO ORDERED.**


_____
**MEGAN P. DUFFY, Judge**

**WE CONCUR:**


_____
**JENNIFER L. ATTREP, Judge**


_____
**SHAMMARA H. HENDERSON, Judge**